J-A25007-15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| SVYATOSLAV BURIK, | : | |
| | : | |
| Appellant | : | No. 228 EDA 2015 |

Appeal from the Judgment of Sentence December 16, 2014,
Court of Common Pleas, Bucks County,
Criminal Division at No. CP-09-CR-0003246-2014

BEFORE:  DONOHUE, MUNDY and FITZGERALD*, JJ.

MEMORANDUM BY DONOHUE, J.:                    **FILED December 18, 2015**

Svyatoslav Burik ("Burik") appeals from the judgment of sentence

entered following his convictions of two counts each of stalking, harassment,

terroristic threats, and threat to use weapons of mass destruction ("weapons

of mass destruction").[1]  Following our review, we affirm.

> The trial court summarized the facts underlying
> Burik's convictions as follows: This case arises from
> Defendant's continued and repeated threats
> communicated verbally and posted publicly on the
> Internet directed at Joshua Aybinder and employees
> of a local hospital, St. Mary Medical Center.
>
> St. Mary Medical Center is situated in Langhorne,
> Bucks County, PA and has between twenty -six
> hundred (2,600) and three thousand employees
> (3,000). Trial N.T., 41, 57.1 It is equipped with a
> 24/7 trauma emergency department. ***Id.***

---

[1]  18 Pa.C.S.A. §§ 2709.1(a)(2), 2709(a)(4), 2706(a)(1), 2715(a)(4).

*Former Justice specially assigned to the Superior Court.

In 2009, Joshua Aybinder was employed as an emergency medical technician ("EMT") at St. Mary Medical Center. Trial N.T., 41. On February 16, 2009, while he was working in the emergency department of the hospital, he came into contact with Defendant. *Id.* at 42. He was previously acquainted with [Burik] because the two were in the same graduating high school class. *Id.* Mr. Aybinder was assigned to assist with the safety of the staff members during an ordered catheterization procedure. *Id.* at 43-44. As he was assisting, [Burik's] demeanor was threatening, although Mr. Aybinder testified truthfully that there were words spoken but he could not specifically recall which words were being directed at him. *Id.* at 44-45. Mr. Aybinder did not come into contact with Defendant for the next year. *Id.* at 46. However, in 2010 Mr. Aybinder received a Facebook message from [Burik] that was threatening in nature. *Id.* at 45 -46. Again, Mr. Aybinder could not specifically recall the exact words that were uttered, but could only remember their alarming effect. *Id.* Again, Mr. Aybinder did not receive any communication from [Burik] again until July 14, 2013, when [Burik] sent him the following Facebook message:

> You do realize that you and your staff team deserve to be rotting in a jail cell now, right? I pray, everyday [sic], that St. Mary's medical center is demolished while you are still in it. I pray everyone that you wronged comes back to you at night with a [sic] insatiable thirst for vengeance. Enjoy your life. As short as I hope that it is. You deserve less.

Trial N.T. 49; *See* Exh. C -2. Shortly after receipt of all of these statements and/or messages, Mr. Aybinder brought them to the attention of the nurse manager for the emergency department of St. Mary Medical Center. Trial N.T., 47, 50, 52-53.

On March 29, 2014, the Counter-Terrorism OPS Unit of the Philadelphia Police Department received

information through a tip line that an individual, later identified as [Burik], made numerous threats through Facebook. Trial N.T., 10. Detective Lawrence Richardson of this unit conducted an independent investigation and, in doing so, verified and preserved this information. *Id.* at 10-11; See Exh. C-1. Detective Richardson discerned that "posts" made by [Burik] to the Facebook website from as recently as the day before the tip- March 28th were of concern and necessitated immediate law enforcement action. Trial N.T., 13, 17.

In referencing the relevant posts, Detective Richardson recited, verbatim, their contents, including "Threatened by a cop? Don't think twice. Kill em before he/she kills you. Try to do that job, pussies. It should've been a gun. And it should've fucked you all to death long ago. These people should be armed and they should be pulling their triggers down your throat. Go ahead. Stop me. I'll fucking stop you forever, honey pie!" Trial N.T., 24; See Exh. C-1, p. 7. To this particular posting displayed on February 21, 2014, [Burik] further commented that he had a "wire saw" that fit in his wallet and proclaimed that "... Dude this shit cuts people in half in seconds," "Also shreds through Kevlar, [G]ortex, flannel, lace, etc.," "If you don't shoot first ... Ah, well you're just stupid," etc. Trial N.T., 24 -25; *See* Exh, C-1, p. 7.

Approximately a month later, on March 24th, [Burik] posted "If you like cops then you are still a whore. You are not a man until you've killed a cop." Trial N.T., 23; *See* C-1, p. 5. Later that day, he also posted "Life goal: kill all cops in cold blood," followed by his own comment that "[t]hey serve themselves. And they can continue to do so in hell. Drown em, bum em, electrocute em, starve em, cut em, hang em ... Do whatever ... Just exterminate them all. .. K ?" *Id.*

On March 25th, [Burik] posted "Another wonderful day to kill cops on site," followed by additional

comments made in response to another individual's criticism of this previous declaration, including, but not limited to "It is my duty to kill cops on sight," "Bloody police badges are very well prized here;" "I'd collect testicles but since they possess none … ;" and "They want pain. We fucking give it to em!" Trial N.T., 20 -22; *See* Exh. C-1, p. 4.

The posts made just one day prior to the tip that precipitated this investigation proved even more concerning as, on March 28th, [Burik] posted[,] "When you kiss your cop husband and go to work to St. Mary's medical center, make sure that kiss means something. For there are those waiting for that right moment. Go to work. Do your flicking job. And die." Trial N,T., 14; *See* Exh. C-1, page 1. Following this first post, [Burik] immediately posted, verbatim, as follows: "Put a flicking pipe bomb in St. Mary's cunt. Remember my name." Trial N,T,, 14; *See* Exh, C-1, p. 2. Following this statement, the post "goes through a series of R's and A's in which [Defendant] is simulating an explosion," *Id.*

Detective Richardson described additional posts [Burik] made which were disconcerting, including the "comments" he made in response to his own post, which appear directly below, Trial N.T., 15-19; *See* Exh. C-1, p. 3. The post reads[,] "I wish to make hamburger meat out of all those who hold any minute association with St. Mary's medical center. How many hale Mary's? I think I've used all mine up." Trial N.T. 17; *See* Exh. C-1, p. 3. [Burik's] own replies to this post are documented sequentially as follows, verbatim:

1. A pipe bomb with rosary beads. Metal ones of course. Where's the Unabomber when you need him. I'll show em a little home grown.

2. Turn that fucking place into a graveyard.

3. It'll be federal, but it'll be worth it for the screams of anguish and the message conveyed.

4. Have fun at work Monday, cocksuckers! Mother Mary gonna have a miscarry.

5. Who will cover their asses when they're all burning alive? Who will corroborate their false claims and statements? When shrapnel is sent hurling through their skulls.

6. Coming after me won't make you any less dead and forgotten.

7. How well is that picture illustrated?

8. Could use a little more red. Black. Gray.

9. Still working on training your empaths [sic] for that pre -crime dream? Not soon enough. Help only comes when the last tune's been played, No one will save you!

10. Not Jesus. Not Mary. Not the Holy Ghost. Not the Spirit, Not the Father. Go ahead. God to work. You're fucking dead.

11. Maybe make it a Sunday thing. More suiting ... The darkness will swallow you whole!!!

12. 98.1 wogl better stop hocking their shit, Pay them a nice little visit. Hahahahahaha!!!

13, Put a fucking pipe bomb in St. Mary's cunt. Remember my name!!! ...

Trial N.T. 17 -19; **See** Exh. C-1, p. 3.

Mr. Aybinder was aware of the existence of these posts and comments and their contents. Trial N.T., 50. Significantly, although Mr. Aybinder is no longer employed by St. Mary Medical Center, his wife continues to work as a nurse in their emergency department. **Id.** at 50 51.

Following review of the posts, Detective Richardson informed St. Mary Medical Center and the Middletown Township Police Department ("MTPD"), the township in which St. Mary Medical Center is situated, of the threats. *Id.* at 27-28. St. Mary Medical Center's staff members were in turn advised of the threats. *Id.* at 58.

Detective Richardson then attempted to locate [Burik], and he, along with other officers, "used a police system in which we run a person's name through and it gave us a ... cell phone number for [Burik]." Trial N.T., 26. It was then determined, based on the cell phone number, that T-Mobile was the carrier. *Id.* T-Mobile was able to "ping" the cell phone to determine it's [sic] exact location- which was 8100 Algon Avenue, Apartment 305, in the Northeast Section of Philadelphia. *Id.* at 26-27, 28. Law enforcement responded to that residence, secured the property, and thereafter knocked on the door and [Burik] answered. *Id.* at 28-29, 62-63. [Burik] gave consent for officers to search. *Id.* at 30. Officers conducted a search to determine whether there were any bombing materials or weapons in the apartment. *Id.* The search came back negative. *Id.* Thereafter, custody of [Burik] was turned over to Detective David Strother of the MTPD during the early morning hours of March 30, 2014, *Id.* at 31-32, 64-65, 69.

At MTPD, Detective Strother apprised [Burik] of his rights pursuant to *Miranda v. Arizona*, and [Burik] agreed to waive those rights and speak to the detective. Trial N.T., 65-68; *see* C-3. [Burik] admitted that he made all of the aforementioned posts from his cellular telephone. Trial N.T., 69-70. [Burik] explained that he was antiestablishment and anti-Catholic Church. *Id.* at 70-71.

As a result of these threats, security at St. Mary was heightened and additional security guards were added. *Id.* at 56-57. Furthermore, although security guards at St. Mary are not ordinarily armed, private

- 6 -

armed security was hired on a 24/7 basis for one (1) month. *Id.* at 57-58.

[Burik] was arrested on March 30, 2014 and charged with two (2) counts of [s]talking, five (5) counts of [t]erroristic [t]hreats, five (5) counts of [h]arassment, and three (3) counts of [t]hreat to [u]se [w]eapons of [m]ass [d]estruction (originally titled "[b]omb [t]hreats" and referred thereto throughout the Criminal Information).

A waiver trial took place on August 19, 2014, and, following presentation of evidence and argument, [the trial court] found [Burik] guilty of the [two counts of each crime]. Sentencing was deferred pending a pre-sentence investigation and mental health evaluation.

[Burik] was sentenced on December 16, 2014. On Count 1- [s]talking, he was sentenced to not less than eleven (11) months and twenty-nine (29) days nor more than twenty-three (23) months and twenty-nine (29) days[] [of] incarceration. On Count 3- [t]erroristic [t]hreats, [Burik] was sentenced to a five (5) year period of probation, to be served consecutively to his parole. Additionally, on Count 13- [threat to use weapons of mass destruction], [Burik] was sentenced to a second five (5) year period of probation, to be served consecutively to the period of probation imposed on Count 3. No further penalty was imposed on remaining counts.

Trial Court Opinion, 4/20/15, at 1-7 (footnotes omitted).

This timely appeal follows, in which Burik challenges the sufficiency of the evidence as to each of his convictions. When reviewing a sufficiency of the evidence claim, "we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in

the light most favorable to the verdict winner, are sufficient to support all elements of the offense." ***Commonwealth v. Cox***, 72 A.3d 719, 721 (Pa. Super. 2013) (quoting ***Commonwealth v. Koch***, 39 A.3d 996, 1001 (Pa. Super. 2011)). When performing this review, "we may not reweigh the evidence or substitute our own judgment for that of the fact finder." ***Id.***

Burik begins with his stalking convictions. The particular subsection of the stalking statute of which Burik was convicted provides that "[a] person commits the crime of stalking when the person … engages in a course of conduct or repeatedly communicates to another person under circumstances which demonstrate or communicate either an intent to place such other person in reasonable fear of bodily injury or to cause substantial emotional distress to such other person." 18 Pa.C.S.A. § 2709.1(a)(2).

Burik was convicted of two counts of this crime, which alleged the stalking of Mr. Aybinder and St. Mary's, respectively. ***See*** Criminal Information, 6/26/14, at 1. With regard to the conviction relating to Burik's contact with Mr. Aybinder, Burik argues that there was no evidence that he engaged in a course of conduct intending to place Mr. Aybinder in reasonable fear of bodily injury or to cause substantial emotional distress, as there was no evidence as to what he said to Mr. Aybinder in the hospital or evidence of the content of one of the Facebook messages he sent to Mr. Aybinder. Burik's Brief at 19-21.

For this offense, the "course of conduct" element and the intent element are inextricably linked, as in order to establish the requisite course of conduct, one must establish that the communications at issue were made with the requisite intent (i.e., the intent to place a person in reasonable fear of bodily injury or to cause substantial emotional distress). As such, this Court cannot decide whether the evidence is sufficient to establish a course of conduct without considering an appellant's intent.

In **Commonwealth v. D'Collanfield**, 805 A.2d 1244 (Pa. Super. 2002), the appellant sent nine emails to a psychologist who performed a court-ordered evaluation of the appellant for a separate criminal matter. The emails were not offered into evidence and there was no testimony as to the content of the emails. The evidence established only that appellant began sending the emails after the psychologist evaluated the appellant, and that they "were harassing and frankly a bit bizarre in nature, and they did cause [the psychologist] a great amount of concern and alarm." **Id.** at 1248. This Court concluded that the simple fact that the appellant sent multiple emails that caused the psychologist concern and alarm was sufficient to establish a course of conduct. This Court further held that the appellant's intent in sending those messages may be determined by the totality of the circumstances:

> [T]he Commonwealth stated at the sentencing hearing that Appellant sent various bizarre [e]-mails to Dr. Dattilio over the course of a month. The

Commonwealth presented evidence at Appellant's hearing that indicated Dr. Dattilio felt "great concern and alarm" due to the harassing e-mails. It is also clear from Appellant's testimony that he was enraged and out of control due to Dr. Dattilio's diagnosis of him as a paranoid schizophrenic.

We are convinced that this evidence was sufficient to indicate to the trial court that Appellant intended to cause substantial emotional distress to the victim. It is clear that simply because Appellant did not state specifically that he wished to cause "great concern and alarm" or "substantial emotional distress" to Dr. Dattilio that he did not intend to do so. We have held consistently that intent may be inferred from the words or actions of the defendant in light of all attendant circumstances. ***Commonwealth v. Pasley***, 743 A.2d 521, 524 (Pa. Super. 1999) (citing ***Commonwealth v. Chance***, [] 458 A.2d 1371 ([Pa. Super.] 1983)). Here, the trial court was able to infer the malevolent intent required to convict on a charge of stalking by communication because Appellant, incensed by Dr. Dattilio's diagnosis, engaged in a repetitive course of harassment of Dr. Dattilio, the intent of which was to cause great concern and alarm.

***Id.*** at 1249 (footnote omitted).

Similarly, in the present case, Burik contacted Mr. Aybinder after an interaction at St. Mary's during which Burik believes he was sexually assaulted. ***See*** N.T., 12/16/14, at 21. Mr. Aybinder testified that although he could not recall the exact words used, the first message he received from Burik, in 2010, was "threatening in nature." N.T., 8/19/14, at 46. Burik subsequently sent another Facebook message in 2013, the content of which is reproduced above. ***See also*** Commonwealth's Ex. C-1. ***D'Collanfield***

instructs that we need not know the exact content of Burik's 2010 Facebook message, as in consideration of the totality of the circumstances, specifically Mr. Aybinder's interpretation of the message (that it was threatening in nature) and response to it (alerting his supervisor at St. Mary's, *id.* at 47), coupled with his interpretation and response to the subsequent Facebook message (again alerting his supervisor at St. Mary's, *id.* at 50), is sufficient to establish that Burik engaged in a course of conduct with the intent to cause Mr. Aybinder substantial emotional distress.[2]

With regard to his conviction for stalking of St. Mary's, Burik argues that because he made the Facebook posts about St. Mary's "within a relatively short period of time (March 28 and 29, 2014), [they] should be considered one act as they were so close in time and are one Facebook thread." Burik's Brief at 21. He also argues that the conviction cannot stand because St. Mary's in not a person. Burik makes both of these "arguments" without citation to or discussion of a single supportive authority. Our Rules of Appellate Procedure require that each issue an appellant raises must be supported by discussion and analysis of relevant authority. *See* Pa.R.A.P. 2119. Burik has failed to do meet these requirements. It is well established that this court will not become the counsel for an appellant and develop arguments on an appellant's behalf. *Commonwealth v. Kane*, 10 A.3d

---

[2] Tellingly, Burik does not discuss or attempt to distinguish *D'Collanfield* in his argument on this issue.

327, 331 (Pa. Super. 2010). Accordingly, Burik has waived this issue. *See Commonwealth v. Hunzer*, 868 A.2d 498, 516 (Pa. Super. 2005) (holding that an appellant waived a claim where he failed to cite any legal authority in support of an argument in his appellate brief); *Commonwealth v. Ellis*, 700 A.2d 948, 957 (Pa. Super. 1997) (holding waiver results if an appellant fails to properly develop an issue or cite to legal authority to support his contention in his appellate brief).[3]

We reach the same conclusion with regard to Burik's challenges to his harassment convictions, which also are based on the 2010 and 2013 Facebook messages to Mr. Aybinder.[4] After setting forth the definition of the crime, Burik baldly states that because we do not know the content of his 2010 Facebook message to Mr. Aybinder, there is insufficient evidence to

---

[3] Even if we were not to find this issue waived, it would not prevail. The record contains evidence of numerous Facebook posts and comments made by Burik in which he threatened to kill anyone affiliated with St. Mary's and to deploy a pipe bomb to destroy St. Mary's. Commonwealth's Exhibit C-1. For purposes of stalking, a "course of conduct" is "pattern of actions composed of more than one act over a period of time, **however short**, evidencing a continuity of conduct." *Commonwealth v. Leach*, 729 A.2d 608, 611 (Pa. Super. 1999) (emphasis added). Furthermore, we find Burik's statements that he wants to destroy "all of those who hold any minute association with St. Mary's" and "to make sure that kiss [goodbye to a spouse who works at St. Mary's] means something. … Go to work. Do your fucking job. And die," *see* Commonwealth's Exhibit C-1, sufficient to support a finding that he was threatening the individuals that work for St. Mary's, not St. Mary's the corporate entity, as Burik suggests.

[4] "A person commits the crime of harassment when, with intent to harass, annoy or alarm another, the person: … (4) communicates to or about such other person any lewd, lascivious, threatening or obscene words, language, drawings or caricatures." 18 Pa.C.S.A. § 2709(a)(4).

support a finding that he threatened him. Burik's Brief at 24-25. He further argues that the 2013 Facebook message (the content of which is in evidence) "was not a threat. [It] does not state anywhere that [Burik] is going to harm [Mr. Aybinder]. Essentially, [Burik] simply communicated his wishes that bad things happen to [Mr. Aybinder]." *Id.* at 25. Burik's entire discussion as to both of these convictions, which he is challenging on different grounds, is eleven lines long, and he has failed to support his arguments with citation to, much less discussion of, supportive authority. As such, they are waived. *Hunzer*, 868 A.2d at 516; *Ellis*, 700 A.2d at 957.[5]

We now consider Burik's convictions of terroristic threats. The relevant statute provides that "[a] person commits the crime of terroristic threats if the person communicates, either directly or indirectly, a threat to … commit any crime of violence with intent to terrorize another." 18 Pa.C.S.A. § 2706(a)(1). Burik begins from the premise that his convictions were based on the 2010 and 2013 Facebook messages, and

---

[5] Again, we note that even if not waived, these issues would not provide relief. To begin, harassment is a lesser-included offense of stalking. *See Commonwealth v. Reese*, 725 A.2d 190, 192 (Pa. Super. 1999). As such, our discussion regarding whether it is critical to know the content of the 2010 Facebook message in context of stalking applies equally to Burik's harassment convictions. Second, Burik's argument that the 2013 Facebook message was not threatening is challenging the trial court's characterization of the message as such. Burik's challenge is therefore truly to the weight, rather than the sufficiency, of the evidence. As he did not raise a challenge to the weight of the evidence in the trial court or in his Rule 1925(b) statement of matters complained of on appeal, he could not raise it on appeal. Pa.R.Crim.P. 607; Pa.R.A.P. 1925(b)(4)(vii).

argues that his convictions are unsound because the Commonwealth failed to establish, in either message, the intent to commit any crime of violence against Mr. Aybinder. Burik's Brief at 22-24.

Preliminarily, we note that the criminal information and criminal complaint do not specify these Facebook messages as the bases for these charges or allege that the threats were made only against Mr. Aybinder. Both the criminal complaint and the criminal information charge Burik with five counts of terroristic threats, all of which allege that between 2010 and March 29, 2014, Burik "communicated, either directly or indirectly, a threat to commit a crime of violence with intent to terrorize another, namely, Joshua Aybinder and/or St. Mary Medical Center." Criminal Complaint, 3/30/14, at 2; Criminal Information, 6/26/14, at 1. Burik was convicted of Counts Three and Four. During its closing argument, the Commonwealth explained that Count Three was based solely on Burik's February 16, 2010 Facebook message to Mr. Aybinder and Count Four was based solely on the July 14, 2013 Facebook message. N.T., 8/19/14, at 92-93. By virtue of this clarification, the Commonwealth effectively orally amended the criminal information regarding these two counts, narrowing their scope. **See** Pa.R.Crim.P. 564; **Commonwealth v. Sinclair**, 897 A.2d 1218, 1224 (Pa. Super. 2006) (holding that amendment of criminal information on day of trial is permissible if there is no showing of prejudice). The trial court permitted this amendment and Burik did not object, and so we accept that

Counts Three and Four are based, respectively, on the 2010 and 2013 Facebook messages to Mr. Aybinder.[6]

The relevant statute provides that "[a] person commits the crime of terroristic threats if the person communicates, either directly or indirectly, a threat to … commit any crime of violence with intent to terrorize another." 18 Pa.C.S.A. § 2706(a)(1).  With respect to the 2010 Facebook message to Mr. Aybinder, Burik argues that his conviction cannot stand because there is no evidence as to the content of this message.  Burik's Brief at 22-23.  Burik does not cite any authority to support his claim that the content of the communication must be known in order to support a conviction of terroristic threats.  To the contrary, the law provides that elements of this offense may be inferred from the totality of the circumstances.  **See Commonwealth v. Butcher,** 644 A.2d 174, 176 (Pa. Super. 1994); **Commonwealth v. Ferrer**, 423 A.2d 423, 425 (Pa. Super. 1980).  The evidence establishes that Mr. Aybinder assisted in an emergency room procedure on Burik in

---

[6] The trial court indicates that Burik's terroristic threats convictions were based on two specific incidents; the 2009 emergency room encounter between Burik and Mr. Aybinder (Count Three) and the Facebook messages from 2010 and 2013 (Count Four).  Trial Court Opinion, 4/20/15, at 13-14.  This is incorrect.  As we have just explained, the Commonwealth based these counts specifically on the 2010 and 2013 Facebook messages to Aybinder.  However, as we explain **infra**, there are other bases upon which we rely to conclude that the trial court's rejection of Burik's claims was proper.  **See Commonwealth v. Singletary**, 803 A.2d 769, 772-73 (Pa. Super. 2002) ("It is well settled that where the result is correct, an appellate court may affirm a lower court's decision on any ground without regard to the ground relied upon by the lower court itself.").

2009, during which Burik threatened Mr. Aybinder. N.T., 8/19/14, at 45. One year later, Burik sent Mr. Aybinder an "alarming" message on Facebook that was "threatening in nature." *Id.* at 46. Mr. Aybinder could not recall the exact words used by Burik in this message, but he was sufficiently concerned by its content that he informed the nurse manager of St. Mary's emergency department of it. *Id.* at 47. In consideration of the totality of these circumstances, it is reasonable to infer that the content of the 2010 Facebook message contained a threat of violence, as Mr. Aybinder characterized it as "threatening"; the nature of the message prompted Mr. Aybinder to tell his supervisor about it; and Burik previously threatened Mr. Aybinder. Further, we can infer that Burik intended to terrorize Mr. Aybinder with the threat, as Burik believed Mr. Aybinder participated in a sexual assault against him. We therefore conclude that the evidence is sufficient to support Burik's conviction on this count.

With regard to the 2013 Facebook message, Burik argues that the evidence was insufficient because the message did not threaten Mr. Aybinder with a crime of violence. Burik's Brief at 23-24. Burik is attempting to advance this issue for the first time on appeal. In his court-ordered Pa.R.A.P. 1925(b) statement of matters complained of on appeal, Burik first alleged that the evidence was insufficient to support this conviction because "the Commonwealth failed to prove beyond a reasonable doubt the intent elements of such offenses[.]" Concise Statement of Matters Complained of

on Appeal, 2/4/15, ¶ 1. He also alleged that that the evidence was insufficient to support this conviction because Mr. Aybinder could not recall specifically what Burik said to him prior to July of 2013. *Id.* ¶ 2. He did not include the issue he now seeks to raise on appeal. It is axiomatic that issues not included in a court-ordered statement of matters complained of are waived for purposes of appeal. *Commonwealth v. Jackson*, 10 A.3d 341, 347 n.4 (Pa. Super. 2010); Pa.R.A.P. 1925(b)(4)(vii). Our Supreme Court has repeatedly reiterated that this is a bright-line rule and that "in order to preserve their claims for appellate review, appellants must comply whenever the trial court orders them to file a [s]tatement of [m]atters [c]omplained of on [a]ppeal pursuant to Pa.R.A.P. 1925. Any issues not raised in a Pa.R.A.P. 1925(b) statement will be deemed waived." *Commonwealth v. Castillo*, 888 A.2d 775, 780 (Pa. 2005); *see also Commonwealth v. Hill*, 16 A.3d 484, 494 (Pa. 2011). Here, as the lower court ordered Burik to file a Rule statement of matters complained of on appeal, *see* Trial Court Order, 1/15/15, and he failed to include this issue therein, we must find that it has been waived.

Finally, we turn to Burik's claim that the evidence was insufficient to support his convictions of threat to use weapons of mass destruction, which is defined as follows: "A person who intentionally … threatens by any means the placement or setting of a weapon of mass destruction; commits an offense under this section. A separate offense shall occur for each report or

threat to place or set a weapon of mass destruction." 18 Pa.C.S.A. § 2715(a)(4). Burik argues that this evidence was insufficient because it did not establish an explicit threat that Burik, himself, would place a bomb at St. Mary's. Burik's Brief at 26.

We disagree. The evidence against Burik includes a Facebook post from March 29, 2014 in which Burik states, "Put a fucking pipe bomb in St. Mary's cunt. Remember my name!!!" Commonwealth Exhibit C-1. Burik then comments immediately under this statement, "Watch me!" *Id.* The evidence also included a Facebook post by Burik from March 28, 2014, in which he stated, "I wish to make hamburger meat out of all those who hold any minute association with St. Mary's medical center." N.T., 8/19/14, at 17; *see also* Commonwealth Exhibit C-1. Under this statement, Burik commented, "A pipe bomb with rosary beads. Metal ones of course. Where's the Unabomber when you need him. I'll show em [sic] a little home grown." *Id.* Viewing these statements in the light most favorable to the Commonwealth, we have no hesitancy in concluding that it established threats by Burik to place bombs in St. Mary's Medical Center. Of note, Burik states that **he** wants to make "hamburger meat" out of anyone affiliated with St. Mary's, and then immediately references a pipe bomb and states that in the absence of the Unabomber (the notorious manufacturer of homemade bombs), **he'll** "shown em [sic] a little home grown." Similarly, the use of the phrases "remember my name" and "watch me" after the

statement, "Put a fucking pipe bomb in St. Mary's cunt" also supports the conclusion that Burik threatened to bomb St. Mary's Medical Center himself. We therefore find no merit to his claim.

Judgment of sentence affirmed.

Mundy, J. joins the Memorandum.

Fitzgerald, J. files a Concurring and Dissenting Statement.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/18/2015